## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*, | )<br>)<br>)<br>)<br>)<br>) | Chapter 11<br><br>Case No. 17-12560 (JKS)<br>(Jointly Administered) |
| MICHAEL GOLDBERG, as Liquidating Trustee of the Woodbridge Liquidation Trust, successor in interest to the estates of WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,<br><br>Plaintiff,<br><br>vs. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Requested Hearing Date:**<br><br>**Status Conference Scheduled for May 19, 2021 at 9:00 a.m.** |
| Sylvan & Jeannette Jutte, | ) | A.P. No. 19-50308 (JKS) |
| Brian & Robin Korkus, | ) | A.P. No. 19-50309 (JKS) |
| Delton & Jean Christman, | ) | A.P. No. 19-50314 (JKS) |
| Floyd & Lavonne Davis, | ) | A.P. No. 19-50317 (JKS) |
| George & Charlene Iwahiro, | ) | A.P. No. 19-50319 (JKS) |
| Toomas & Pamela Heinmets, | ) | A.P. No. 19-50322 (JKS) |
| Janet V. Dues, | ) | A.P. No. 19-50328 (JKS) |
| Dena Falkenstein, | ) | A.P. No. 19-50329 (JKS) |
| Judy Karen Goodin, | ) | A.P. No. 19-50330 (JKS) |
| Denis W. Hueth, | ) | A.P. No. 19-50331 (JKS) |
| Christian Lester, | ) | A.P. No. 19-50332 (JKS) |
| Jane Marshall, | ) | A.P. No. 19-50335 (JKS) |
| Laurence J. Nakasone, | ) | A.P. No. 19-50337 (JKS) |
| Blaine Phillips, | ) | A.P. No. 19-50338 (JKS) |
| Jeff Schuster, | ) | A.P. No. 19-50341 (JKS) |
| Jennifer Tom, | ) | A.P. No. 19-50342 (JKS) |
| Anita Bedoya & Mark Bedoya, | ) | A.P. No. 19- 50343 (JKS) |
| Anita Bedoya & Julian Duran, | ) | A.P. No. 19-50344 (JKS) |
| Ronald Cole, | ) | A.P. No. 19-50346 (JKS) |
| Ronald Draper, | ) | A.P. No. 19-50347 (JKS) |
| Lawrence J. Paynter, | ) | A.P. No. 19-50351 (JKS) |
| Nannette Tibbitts, | ) | A.P. No. 19-50353 (JKS) |
| Clayton Nakasone, | ) | A.P. No. 19-50832 (JKS) |
| Defendants. | ) | |
| | | |

**DEFENDANTS' MOTION TO TEMPORARILY STAY THE
PROSECUTION OF THEIR COMPLAINTS PENDING THE
DETERMINATION OF DISTRIBUTIONS TO CLASS 3
<u>NOTE CLAIMANTS UNDER THE CONFIRMED PLAN</u>**

The defendants in the 23 adversary proceedings captioned above (the "Movants")

are primarily retired senior citizens who are living upon fixed incomes, and suffer from a

variety of serious medical conditions.  The prosecution of the Complaints against them

poses an existential threat to their retirements, and well-being, for the rest of their lives.  If

the Liquidating Trustee is successful, then the same economic harm that the Debtors

inflicted upon their creditors will be visited upon the Movants.  The Liquidating Trustee

eloquently described such harm in paragraph 2 of his Status Report, when he stated:

> severe economic harm in these Cases was acutely felt by individuals who
> could least afford it.  The harm cannot be overstated, and manifested
> differently in each investor.  Retirement accounts – slowly built over
> decades of work – were wiped out.  Seniors reliant on monthly checks
> from Woodbridge to pay a mortgage or rent could no longer make those
> payments.  Money earmarked for a relative's education instantly
> disappeared.  Illnesses could no longer be adequately treated.

*Status Report, ¶ 2.*  The Movants hope to mitigate this economic harm to the greatest extent

possible by obtaining consensual resolutions of their respective Complaints.

Unfortunately, settlement efforts with the Liquidating Trustee are at an impasse.

This impasse is not the fault of any of the parties.  Instead, it arises from the fact

that the Debtors' cases will ultimately generate significant returns for creditors.  The

Movants believe that these creditor returns will greatly diminish the net preference liability

on their Complaints.  In fact, pursuant to the Liquidation Analysis relied upon by the Court

in confirming the Plan, creditor returns could eliminate up to 70% of net preference

liability in the Complaints.  The Liquidating Trustee disagrees.  He believes that creditor

recoveries will be less than projected under the Liquidation Analysis, and is unwilling to rely upon the Liquidation Analysis.

The parties' different views upon the creditor outcomes that will ultimately be obtained in these cases makes further settlement negotiations, difficult, if not impossible, at this time. The Movants are not willing to "overpay" in order to settle their cases. Likewise, the Liquidating Trustee is not willing to accept "underpayment" to settle these cases. Since neither of the parties should have to "guess," the Movants believe that further litigation should be put on hold until the parties know the actual creditor outcomes in these cases.

Accordingly, by way of this motion (the "Motion"), the Movants request the entry of an order temporarily staying the prosecution of the Complaints until after the Wind-Down Entity has liquidated all of the Debtors' real estate assets, and distributed the net proceeds to the Liquidation Trust, in accordance with the terms of the Plan. In further support of the Motion, the Movants respectfully submit as follows:

## JURISDICTION, VENUE AND RESERVATION OF RIGHTS TO JURY TRIAL

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The Court has authority to stay the prosecution of the Complaints pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code"), and "the power inherent in every court to control the disposition of the causes on its

docket with economy of time and effort for itself, for counsel, and for litigants." *In re Southside House, LLC*, 470 B.R. 659, 684  (Bankr. E.D.N.Y. 2012) (citing Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

3.     While the Court has jurisdiction to consider this Motion, and grant the relief requested herein, the Movants specifically note – for the avoidance of doubt – that they have all asserted their rights Under the Seventh Amendment of the United States Constitution to a jury trial on all causes of action asserted against them in the Complaints. Moreover, none of the Movants have consented to the entry of final orders or judgments by the Court if it is determined (absent consent of the parties) that the Court cannot enter final orders or judgements consistent with Article III of the United States Constitution. Finally, the Movants note that the relief sought in this Motion is clearly non-dispositive relief, only affects the timing of the prosecution of the Complaints, and does not implicate the entry of final orders by the Court in any way.

## RELEVANT FACTS

4.     On December 4, 2017, the Woodbridge Group of Companies, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") commenced filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.     Early in the Debtors' bankruptcy cases, there was significant disagreement among the Debtors' major creditor constituencies – i.e., (i) the Official Committee of Unsecured Creditors (the "Creditors, Committee"), (ii) the Official Ad Hoc Committee of Noteholders (the "Noteholder Committee"), and (iii) the Official Ad Hoc Committee of Unitholders (the "Unitholder Committee") – over how to restructure the

4

Debtors, and maximize the value of their assets,

6.    <u>Plan and Disclosure Statement</u>.  Despite such disagreement, the Debtors, the Creditors' Committee, the Noteholder Committee, and the Unitholder Committee (collectively, the "Committees") were able to reach a consensus on how to best proceed, which ultimately formed the basis for:

- the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors [Docket No. 2839]* (the "Disclosure Statement"); and

- the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Fiduciaries [Docket No. 2903-1]* (the "Plan")

Copies of the Disclosure Statement (without exhibits), and Plan (without exhibits), are attached forth hereto as <u>Exhibits A</u> and <u>B</u>, respectively.

7.    In a nutshell, the Plan and Disclosure Statement provided for the creation of two entities in order to maximize the value of the Debtors' assets, and distribute the resultant proceeds to creditors.  *Disclosure Statement, Article IV, § D, pgs. 72-73.*

8.    The first of these entities is the "Wind-Down Entity."  *Id*.  Its primary purpose is to finish the development and sale of the Debtors' portfolio of 189 real properties.  *Id.*  The second entity is the "Liquidation Trust."  *Id*.  It owns the Wind-Down Entity, and is to receive all of the net proceeds resulting from the sale of the Debtors' real properties by the Wind-Down Entity.  *Id*.  In addition, the Liquidation Trust is responsible for filing and prosecuting avoidance actions.  *Id*.  Finally, the Liquidation

Trust is responsible for distributing proceeds to creditors in accordance with the terms of the Plan. *Id.*

9.      Anticipated Recoveries Under the Plan. The Disclosure Statement, and Plan, among other things, set forth the estimated recoveries for the Debtors' various classes of creditors. In particular, the Disclosure Statement and Plan estimated that Class 3, Class 4, and Class 5 claimants would receive the following recoveries from the Liquidation Trust upon their respective claims:

| Class 3 | Standard Note Claims | 60% - 70% of Net Amounts |
| Class 4 | General Unsecured Claims | 60%-70% of Allowed Amounts |
| Class 5 | Unit Claims | 40%-50% of Net Amounts |

*Disclosure Statement, pg. 5; Plan, Article III, §§ 3.4 – 3.6, pgs. 22 – 23.*

10.     The Liquidation Analysis. The anticipated recoveries set forth in the Disclosure Statement and Plan were derived from the Liquidation Analysis that was attached to the Disclosure Statement. A copy of that Liquidation Analysis is attached hereto as Exhibit C. The Liquidation Analysis was prepared by Bradley D. Sharp and Development Specialists, Inc. ("DSI"). Mr. Sharp, among other things, is the President and CEO of DSI, and the Chief Restructuring Officer of each of the Debtors. *See Declaration of Bradley Sharp in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors [Docket No. 2829], ¶¶ 1 & 37, pgs. 1-2, 15.* (the "Sharp Declaration"). A copy of the Sharp Declaration is attached hereto as Exhibit D.

11.     The three tables that comprise the heart of the Liquidation Analysis compare the anticipated recoveries under the Plan versus (i) "Best Case Chapter 7 Recoveries," (ii) "Noteholder High Case Chapter 7 Recoveries," and (iii) "Unitholder High Case Chapter 7 Recoveries."  The summary of the "Plan Recoveries" versus the "Three Chapter 7 Recoveries" provides as follows for Class 3 Standard Note Claims, Class 4 General Unsecured Claims, and Class 5 Unit Claims:

| Claimant | Plan Recoveries | Base Case Chapter 7 Recoveries | Noteholder High Case Chapter 7 Recoveries | Unitholder High Case Chapter 7 Recoveries |
|---|---|---|---|---|
| Class 3 | 68.2% | 45.8% | 56.2% | 43.4% |
| Class 4 | 68.2% | 45.8% | - | 43.4% |
| Class 5 | 49.4% | 33.2% | - | 43.4% |

*Liquidation Analysis, pg. 143 of 503, pg. 144 of 503, and 145 of 503.*

12.     None of the anticipated recoveries to creditors is dependent upon the recoveries on any avoidance actions.  The Liquidation Analysis itself makes this point clear by (i) ascribing no value to the Liquidating Trust Assets, Net (as that term is defined by the Plan)[1], and (ii) stating in Note 3 of the Liquidation Analysis that:

---

[1] Article I, § 1.78 of the Plan defines "Liquidation Trust Assets" as:

> Collectively, (a) the Liquidation Trust Actions, (b) the Liquidation Trust Funding, (c) 100% of the membership interests in the Wind-Down Entity and the Remaining Debtors (and all proceeds and distributions from such entities), (d) Available Cash as of the Effective Date and Available Cash that is possessed by or turned over to the Liquidation Trust After the Effective Date, and (e) other non-real-estate-related assets or entities that may be transferred or otherwise provided, directly or indirectly, to or for the benefit of the Debtors (after the Petition Date but before the Effective Date) or the Liquidation Trust (on or after the Effective Date) by any Person.

*Plan, Article I, § 1.78, pgs. 10-11.*  In turn, Article I, § 1.76 defines "Liquidation Trust Action" as:

> Collectively, all Avoidance Actions and Causes of Action held by the Debtors or the Estates and any Causes of Action that are contributed to the Liquidation Trust as Contributed Claims, in each case as against any Person that is not a Released Party.

*Plan, Article I, § 1.76, pg. 10.*  Finally, "Avoidance Action" is defined by Article I, § 1.5, which states:

> Any and all causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code sections 542, 544, 547, 548, 549, 550, 551, or 553,

7

[p]rojecting litigation recoveries and costs with accuracy is particularly difficult due to the uncertainties arising from ongoing discovery in pending litigation, disputed legal issues, limited data regarding collectability and the transfers of property in kind, which property itself may be difficult to accurately value.

*Liquidation Analysis, Note 3, pg. 147 of 503.*  Moreover, the same point is made in

Article IV, § D 2 of the Disclosure Statement, which states, in pertinent part, that:

- The Debtors estimate an ultimate range of aggregate recoveries from sales of real property and other Wind-Down Assets in the range of $521 million to $583 million, net of operating and other expenses through the end of the Liquidation Analysis projection period.

- The Debtors have not ascribed any value to recoveries that may be realized by the Liquidation Trust in respect of any Liquidation Trust Actions, but the Liquidation Trust Actions may generate significant value.

*Article IV, § D 2 of the Disclosure Statement, pg. 73.*

13.   <u>The Wind-Down Business Plan</u>.  The values used in the

Liquidation Analysis to determine anticipated creditor recoveries came from a business

plan – called the "Wind-Down Business Plan" – developed by Frederic Chin, in

consultation with numerous professionals, including professionals retained by the

Committees.  *See Declaration of Frederick Chin in Support of Confirmation of the First*

*Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC*

*and its Affiliated Debtors [Docket No. 2833]* (the "Chin Declaration"), ¶ *7, pgs. 3-4.*[2] A

---

or under the related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

*Plan, Article I, § 1.5, pgs. 3 – 4.*

[2] Two versions of the Chin Declaration were filed with the Court.  These versions consisted of both a "Sealed" copy of the Chin Declaration, that presumably contained confidential information about the Debtors' properties [Docket No. 2832], and the "Redacted" version that was publicly filed [Docket No. 2833] and is attached hereto.

copy of the redacted Chin Declaration is attached hereto as <u>Exhibit E</u>.  A copy of the

publicly available Wind-Down Business Plan is attached hereto as <u>Exhibit F</u>.

14.     In paragraph 8 of the Chin Declaration, Mr. Chin gave his overall,

qualified assessment of the Wind-Down Business Plan, stating:

> [t]he Wind-Down Business Plan is premised on the orderly disposition of
> the Wind-Down Entity's real estate assets through April 2021.  Based on
> the various conditions and assumptions of the Wind-Down Business Plan,
> the estimated net recovery proceeds available for distribution to the
> Liquidation Trust are projected to be approximately $521 million to $582
> million.

*Chin Declaration, ¶ 8, pg. 4.*

15.     <u>Confirmation Hearing</u>.  On October 19, 2018, the Debtors filed the

*Debtors' Memorandum of Law (I) In Support of Confirmation of the First Amended Joint*

*Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its*

*Affiliated Debtors; and (II) In Response to Filed Confirmation Objections [Docket No.*

*2828]* (the "Confirmation Brief").  A copy of the Confirmation Brief is attached hereto as

<u>Exhibit G</u>.  Therein, the Debtors immediately relied upon the high amount of anticipated

creditor recoveries as a basis for confirming the Plan, stating:

> As described in more detail in the Disclosure Statement, the Plan provides
> for an estimated 60% to 70% recovery for Holders of Standard Note
> Claims, General Unsecured Claims, and Non-Debtor Loan Note Claims
> and an estimated 40%-50% recovery for Holders of Unit Claims.

*Confirmation Brief, ¶ 2, pg. 2.*

16.     On October 24, 2018, the Court held a hearing upon confirmation

of the Plan (the "Confirmation Hearing").  During the course of the Confirmation

Hearing, the Debtors' Liquidation Analysis was directly addressed to the Court by

Counsel for the Debtors, who, among other things, stated:

> Before I get to the specific points I do want to note for the record, particularly the liquidation analysis prepared by DSI and included with the disclosure statement at Exhibit B, as well as the Sharp declaration at Paragraphs 34 to 39 readily establishes the best interest of creditors test under Section 1129(a)(7), Your Honor.  Importantly, that analysis included multiple scenarios.
>
> DSI prepared a noteholder high-case that assumed that noteholders received all distributable value that's available in a Chapter 7 scenario.  They also prepared a unitholder high-case that made a *pari passu* assumption.  Neither of those results would obtain absent a very long and hard-fought litigation, but they prepared the analysis to see what those numbers showed.
>
> What the results showed, Your Honor, is that in all possible scenarios noteholders and unitholders do better under the plan then they do in Chapter 7.  This satisfies Section 1129(a)(7) …

*Confirmation Hearing Transcript, pg. 58, ln. 8 – ln. 25.*  A copy of the Confirmation

Hearing Transcript is attached hereto as <u>Exhibit H</u>.

       17.     On October 26, 2018, the Court confirmed the Plan, and entered its

*Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint*

*Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its*

*Affiliated Debtors [Docket No. 2903]* (the "Confirmation Order").  A copy of the

Confirmation Order (without exhibits) is attached hereto as <u>Exhibit I</u>.

       18.     In paragraph W of the Findings of Fact and Conclusions of Law of

the Confirmation Order, the Court specifically relied upon the Liquidation Analysis in

connection with its confirmation of the Plan, stating:

> The "best interests" test under Bankruptcy Code section 1129(a)(7) is satisfied as to all impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes either has voted to

accept the Plan or will receive or retain property of a value as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. More specifically, the liquidation analysis [Docket No. 2398, Exhibit B] filed by the Debtors, the Confirmation Declarations, and all other applicable evidence proffered or adduced at the Confirmation Hearing (i) are reasonable, persuasive, and credible; (ii) are based on reasonable and sound methodologies and assumptions; (iii) provide a reasonable estimate of the liquidation values of the Debtors upon hypothetical conversion to cases under chapter 7 of the Bankruptcy Code; and (iv) establish that each Holder of a Claim or Equity Interest in the Impaired Classes will receive or retain, on account o such Claim or Equity Interest, property under the Plan of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

*Confirmation Order, ¶ W, pg. 11.*

19.     Additionally, in paragraph NN of the Confirmation Order, the

Court found that the Debtors had been acting as a Ponzi scheme, stating:

The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.

*Confirmation Order, ¶ NN, pg. 15.*

20.     The Liquidation Trust. On September 24, 2018, the Debtor filed

the *Notice of Filing of Plan Supplement Documents [Docket No. 2657]* (the "Plan

Supplement"). A copy of the Plan Supplement is attached hereto as Exhibit J. Pursuant

to the Plan Supplement, the Debtors, among other things, filed (i) a form Liquidation

Trust Agreement, (ii) a schedule of agreements to be assumed under the Plan, and (iii) a

form of "Wind-Down Governance Agreement."

21.     <u>Relevant Post-Confirmation Events</u>.  The Plan became effective on February 15, 2019.  *See Notice of Confirmation of, and Effective Date of, First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors [Docket No. 3421]*.

22.     On September 13, 2019, the Liquidating Trustee sent correspondence (the "September 13th Correspondence") to the beneficiaries of the Liquidation Trust, advising them, among other things, upon certain "updated estimates" regarding the recovery upon their claims.  A copy of the September 13th Correspondence is attached hereto as <u>Exhibit K</u>.  Therein, in particular, the Liquidating Trustee stated:

> Updated estimates regarding beneficiary recoveries
>
> In conjunction with preparing the financial information required in the Registration Statement, the Trust and the Wind-Down Entity have approved a revised business plan for the liquidation of the real properties formerly owned by the Woodbridge debtors and now owned by the Trust's subsidiaries.  The revised business plan takes into account updated financial circumstances and the current state of the Los Angeles real estate market, which has substantially changed during the past 12-18 months. As many of you know, the vast majority of the projected recovery is from real properties located in Los Angeles; accordingly, estimated recoveries are heavily dependent on the state of the Los Angeles real estate market.
>
> Pursuant to the revised business plan, the Trust estimates the following approximate recoveries by Noteholders, Unitholders and General Unsecured Creditors:

| Class 3 | Note Claims | 40% - 63% of Net Amounts |
| Class 4 | General Unsecured Claims | 40%-60% of Allowed Amounts |
| Class 5 | Unit Claims | 29%-46% of Net Amounts |

> The foregoing numbers are estimates, and are not guarantees of recovery, and it is projected to take approximately two years to realize these results. The actual results and the estimated timeline may vary from these estimates.  Variations may be based on numerous factors, including, but not limited to, continued changes in the Los Angeles real estate market.

The foregoing estimates do not include any significant recoveries from litigation brought or to be brought by or on behalf of the Trust, as such recoveries are highly unpredictable at this time.

*September 13th Correspondence, last page.*

23.    The Complaints.  Commencing in August, 2019, the Liquidation

Trust commenced filing numerous complaints against noteholders, and other individuals.

Upon information and belief, approximately 490 of such complaints were filed.  The

complaints filed against noteholders generally seek the avoidance of two types of

transfers.

24.    The first type of transfers is for the avoidance of all payments

made to noteholder defendants during the 90-day period (the "Preference Period") before

the Debtors' respective bankruptcy filings.  The purpose of these claims is to recover all

payment of principal that was returned to noteholders during the Preference Period.

25.    The second type of transfers is for the avoidance of all interest

payments that the Debtors' made to noteholder defendants during the two-year period

before the Debtors' bankruptcy filings.

26.    In the complaints filed against the noteholder defendants (which

appear to be virtually identical, except with respect to the names of the defendants, and

the amounts of the transfers at issue), the Liquidating Trustee asserted the position that

because of the Bankruptcy Court's finding in paragraph NN of the Confirmation Order

(i.e. – that the Debtors were operating as a Ponzi scheme during the time of the transfers),

there are essentially no defenses available to noteholder defendants, such as ordinary

course under section 547(c) of the Bankruptcy Code, or fraudulent transfer liability under section 548 of the Bankruptcy Code, or applicable state law.

27.     The Law Office of Curtis A. Hehn was retained as counsel to defend against avoidance liability for the defendants in 29 complaints (the "Complaints"). Two of these Complaints were dismissed because the defendants therein died, while three Complaints were settled, and the undersigned counsel has filed a motion to withdraw from representing the parties in one of the Complaints.  The remaining 23 Complaints are against the Movants, who are more specifically identified on the spreadsheet attached hereto as Exhibit L.

28.     Exhibit L, among other things, sets forth:  (i) the  identity of each of the Movants; (ii) the adversary proceeding number for each of their respective Complaints; (iii) the state in which they reside; (iv) their respective ages; and (v) the amounts of the preference and fraudulent transfer claims asserted against each Movant. The total amount of preference claims asserted against the Movants is $4,340,434.86, while the total amount of fraudulent transfer claims asserted against the Movants is $289,933.11.

29.     As can be seen from a review of Exhibit L, all of the Movants are individuals, the majority of whom are retired senior citizens, or parties that are close to retirement age.  These retirees live on social security, or a combination of social security and whatever investment income, and savings, they were able to acquire over their lives.

30.     All of the Complaints are subject to a scheduling order that stays discovery until after the conclusion of mediation by the parties.  So, absent a consensual

14

resolution during mediation, litigation over the Complaints is still in a very nascent stage, especially in light of the delay engendered by the Covid-19 Pandemic.

31.     In addition to having to live within the confines of fixed income, many of the Movants suffer from serious medical conditions that require a significant amount of their disposable income to treat.  These medical conditions include, but are not limited to, dementia, suffering from the damage done by heart attack, hypertension, heart disease, other serious cardiac or circulatory conditions, lupus, and cancer.  Likewise, many of the Movants suffer from financials issues, which have been exacerbated by the Covid-19 Pandemic, or have other hardships in their lives.  For example, one of the Movants had her entire home, and literally all of her worldly possessions destroyed in the "Thomas Fire" that occurred in southern California in December, 2017.  She has still not received any compensation from Southern California Edison, whose power lines were determined to have started the fire, and has had to live, at least in part, upon the return of principal that is the subject of the preference claim pending against her.

32.     All of the Movants were counting on the return of their principal investments in the Debtors when they made such investments, and had no idea that they could potentially be forfeiting all, or a majority, of their retirement savings.

33.     <u>Mediation and the Difficulty of Settlement</u>.  As of the time of the filing of this Motion, only three of the Complaints have been consensually resolved through mediation.

34.     While the consensual resolution of three Complaints is positive for all of the parties, the Movants do not believe that settlement will be reached on any of the

remaining Complaints at this time, and that further mediations at this juncture in the

Debtors' cases will be fruitless.

35.    The Movants' pessimism over settling additional Complaints has

nothing to do with the actions of the parties, or the assistance provided by the mediator,

who is Connor Bifferato.  While taking tough positions, the Liquidating Trustee, and his

counsel, have acted honorably throughout the course of these adversary proceedings, and

are proceeding in good faith.  Likewise, the Movants, and their counsel, have acted

honorably through the course of these adversary proceedings, and are proceeding in good

faith.

36.    Moreover, Connor Bifferato, as the parties' mediator, has gone

above and beyond the call of duty in trying to assist the parties in reaching consensual

resolutions of their matters.  Despite all of the foregoing, however, the cases are still not

settling like all of the other matters that counsel for the Movants has litigated with

counsel for the Liquidating Trustee.[3]

37.    <u>The Core Issue Preventing Settlement</u>.  Further settlements are at

an impasse because the parties have very different views upon the  recoveries that will

ultimately be obtained by creditors in these cases. [4]  These disparate views are preventing

the parties' from reaching agreement on how to value the net preference liability for each

---

[3] Since opening my Firm in October, 2015, I have consensually resolved 18 preference actions with the Liquidating Trustee's counsel in other bankruptcy cases.  A list of those cases is attached hereto as <u>Exhibit M</u>.  So we know how to do the work, but can't get to consensual resolutions at this point in time in these cases.

[4] Pending the Court's determination upon the relief requested in this Motion, the Movants will not proceed with the mediations scheduled for their matters, as they believe such efforts will be futile.

of the Complaints, which is the starting point for the negotiation of a consensual resolution.

38.    <u>The Movants' View</u>.  The Movants submit that their respective avoidance liability is significantly less than the face value of the Complaints filed against them for two reasons.[5]  First, pursuant to the Liquidation Analysis and Plan, the holders of Class 3 Standard Note Claims are expected to recover approximately 60% to 70% of the value of their claims.  Second, section 502(h) of the Bankruptcy Code entitles the Movants to file claims for funds collected on account of their respective preference liabilities.  In light of these two factors, the Movants submit that their net preference liability upon account of their respective Complaints should only be 30% to 40% of the face value of such Complaints, and that this reduced value should be the starting point for the parties' settlement negotiations.

39.    <u>The Liquidating Trustee's View</u>.  The Liquidating Trustee has a different view.  While the Liquidating Trustee's views were communicated as part of the mediations that occurred in these cases, and therefore cannot be disclosed pursuant to Local Rule 9019-5, the Court can readily surmise that his views on valuation arise from the revised creditor recoveries for Class 3 Note Claims set forth in the September 13th Correspondence attached hereto as <u>Exhibit K</u>.  Therein, the Liquidating Trustee estimates that Class 3 Note Claims will receive recoveries that range from 40% to 63% of the face value of their claims.

---

[5] These two reasons have nothing to do with any defenses to avoidance liability that the Movants may also have.

40.    <u>Liquidation Trust's Current Financial Status</u>.  On April 29, 2021,

the Liquidating Trustee filed the *Notice of Quarterly Report of the Liquidation Trust*

*[Docket No. 4645]* for the period ending December 31, 2020 (the "Quarterly Report").  A

copy of the Quarterly Report is attached hereto as <u>Exhibit N</u>  The Quarterly Report is the

most recent quarterly report that is publicly filed and available.  Pursuant thereto, the

Liquidation Trust disclosed "Net Assets in Liquidation" in the amount of $210,476,000,

which included "Cash and cash equivalents" in the amount of $126,596,000.  *Quarterly*

*Report, Part I.  Financial Information, Page 3 of 44*.

41.    <u>Status Report</u>.  On May 5, 2021, the Liquidating Trustee filed the

*Liquidation Trust's Status Report for May 19, 2021 Status Conference [Docket No. 4646]*

(the "Status Report").  A copy of the Status Report is attached hereto as <u>Exhibit O</u>.

42.    In the Status Report, the Liquidating Trustee, among other things,

set forth a brief history of the Debtors' cases, disclosed the status of (i) the Avoidance

Actions pending before the Court, and (ii) certain litigation matters pending before other

courts.  The Status Report did not disclose the anticipated reductions in creditor

recoveries that was set forth in the Liquidating Trustee's September 13th Correspondence.

(*See* <u>Exhibit K</u>)

## **RELIEF REQUESTED**

43.    By way of this Motion, the Movants seek the entry of an order

temporarily staying all further litigation on their Complaints, including mediation, until

after the Wind-Down Entity has liquidated the remainder of the properties in its

possession.  At that point in time, the Liquidating Trustee and the Movants will know the

actual recoveries for Class 3 Note Claims.  This knowledge will eliminate the significant

difference that exists over the parties' competing valuations of the Movants' net

preference liability, and thereby maximize the potential for consensually resolving the

Complaints.

### BASIS FOR RELIEF

44.    Stays of litigation are not new.  As the Supreme Court observed

back in 1936:

> the power to stay proceedings is incidental to the power inherent in every
> court to control the disposition of the causes on its docket with economy
> of time and effort for itself, for counsel, and for litigants.

*Landis V. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936).  In the

context of bankruptcy, this inherent authority resides in section 105(a) of the Bankruptcy

Code, which permits the court to "issue any order, process, or judgment that is necessary

or appropriate to carry out the provisions of" the Bankruptcy Code.  *See:  11 U.S.C. §

105(a)*; *In re South Side House, LLC*, 470 B.R. 659, 684 (Bankr. E.D.N.Y. 2012);

*Musselman v. Home Ins. Co. of Ind. (In re Finley, Kumble, Wagner, Heine, Underberg,

Manley, Myerson & Casey)*, 1990 WL 123840, at *2 (S.D.N.Y. Aug. 7, 1990) (finding

that the bankruptcy court has the inherent authority to enter a stay of an adversary

proceeding).

45.    "The determination whether to issue a stay is committed to the

court's sound discretion."  *South Side House*, 470 B.R. at 684.  Moreover, "the decision

whether to grant a stay 'calls for the exercise of judgment, which must weigh competing

interests and maintain an even balance.'"  *Id.*

46.     "The party seeking a stay bears the burden of 'demonstrating the wisdom and justice of a stay.'" *Id.* (quoting *Uni-Rty Corp. Guangdong Bld., Inc. (In re Uni-Rty Corp.)*, 1998 WL 299941, at *7 (S.D.N.Y. June 9, 1998) (quoting *John's Insulation, Inc. v. Siska Constr. Co.*, 671 F.Supp. 289, 297 (S.D.N.Y. 1987).

47.     The list of factors considered by courts in determining whether to grant a stay include:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Id.* (*quoting Kappel v. Comfort*, 914 S.Fupp. 1056, 1058 (S.D.N.Y. 1996) (quoting *Volmar Distribs. v. N.Y. Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993).  Moreover, "[i]n balancing these factors, the basic goal is to avoid prejudice." *TradeWinds Airlines, Inc. v. Soros*, 2011 WL 309636, at *3 (S.D.N.Y. Feb. 1, 2011) (quoting *Kappel*, 914 F.Supp. at 1058).

48.     Finally, a stay may be appropriate for a variety of reasons, including the promotion of judicial economy, or to avoid confusion or inconsistent results.  *South Side*, 470 B.R. at 685; *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 199 (Bankr. S.D.N.Y. 2002).

I.     **The Balance of the Interest of the Liquidating Trustee in Proceeding Expeditiously With the Prosecution of the Complaints Versus the Prejudice to the Liquidation Trust Caused by Delay Support Granting a Stay**

49.     The Movants acknowledge that the imposition of a stay will impose some burden upon the Liquidating Trustee.  In particular, the Liquidating Trustee

will lose the ability to keep all of the "noteholder complaints" on the same litigation track, and will incur additional costs and expenses from having to separately track the stayed matters when they come back on line.  These burdens, however, are significantly mitigated by two factors.

50.    First, the Litigation Trust is not an insolvent entity.  Unlike many other chapter 11 cases in this District, the Debtors' cases are, comparatively speaking, awash with cash.  According to the Quarterly Report attached hereto as Exhibit N, in the last quarter of 2020, the Liquidation Trust had "Net Assets in Liquidation" in the amount of $210,476,000, which included "Cash and cash equivalents" in the amount of $126,596,000.  Even if these amounts have decreased since the last quarter of 2020, due to subsequent disbursements to creditors, the Liquidation Trust is still a highly solvent entity.  It clearly has the resources necessary to deal with the additional modicum of expense that will accrue if the Court grants the relief requested by this Motion.  While this additional expense will impose some burden upon the Liquidating Trust, that burden will be *de minimis* in the grand scheme of these cases, and will not threaten the operation of the Liquidating Trust in any meaningful way, or diminish the distributions to creditors, which are based upon the proceeds generated from the sales of the Debtors' properties by the Wind-Down Entity.  Moreover, the imposition of the stay requested herein may in fact save the Liquidating Trust money, if the end result of that stay is more of the Complaints are consensually resolved, without the need for trial, after the ultimate creditor outcomes are determined.

51.    Second, there are several other pieces of litigation described in paragraphs 21 through 23 of the Status Report, that will probably still be pending after the Wind-Down Entity has completed the development and sale of the Debtors' remaining real estate portfolio.  Accordingly, the imposition of the stay requested herein will not increase, in any appreciable measure, the time needed by the Liquidation Trust to fully complete the liquidation of all of the Liquidation Trust Assets.

52.    So, on balance, neither the interest of the Liquidating Trustee in expeditiously litigating the Complaints, nor the prejudice to the Liquidation Trust that will accrue if a stay is granted, weigh in favor of denying the Movants' request for a stay.

## II.    The Strong Interests of the Movants in Obtaining Stay, and the Burden That Will be Imposed Upon the Movants If a Stay is Not Granted, Greatly Favor the Granting of a Stay

53.    In the Status Report, counsel for the Liquidating Trustee eloquently described the harm that befell note holders in these cases, stating:

> severe economic harm in these Cases was acutely felt by individuals who could least afford it.  The harm cannot be overstated, and manifested differently in each investor.  Retirement accounts – slowly built over decades of work – were wiped out.  Seniors reliant on monthly checks from Woodbridge to pay a mortgage or rent could no longer make those payments.  Money earmarked for a relative's education instantly disappeared.  Illnesses could no longer be adequately treated.

*Status Report,* ¶ *2* (*See* <u>Exhibit O</u>).  The Movants are at risk of being inflicted with exactly this same type of severe economic harm as a result of the prosecution of the Complaints.

54.    While the Movants recognize that the Liquidating Trustee is legally obligated to pursue the avoidance actions against them, it is imperative for the

Movants' survival that the economic harm resulting from such pursuit be minimized as much as possible, pursuant to the law, and the facts and circumstances surrounding their cases.  This can be achieved by ensuring that the ultimate creditor recoveries in these cases are used to determine the Movants' actual net preference liability.

55.     The Movants believe that it is reasonable for them to rely upon the recoveries projected in the Liquidation Analysis to determine their respective net preference liability.  After all, the Liquidation Analysis was the product of hundreds of thousands – if not millions – of dollars of professional time by DSI, Mr. Sharp, Mr. Chin, the Debtors' other professionals, and all of the Committees' professionals, and was the heart of the Plan.

56.     Moreover, the projected recoveries in the Liquidation Analysis were the prominent driver in the confirmation of the Plan, were specifically cited in the Sharp Declaration, the Confirmation Brief, and during oral argument at the Confirmation Hearing, and were relied upon by the Court in confirming the Plan.  So, from the Movants' vantage point, the creditor returns projected in the Liquidation Analysis have all of the indicia of reliability, and should be used to determine their respective net preference liabilities.  This view is buttressed by the findings in paragraph W of the Findings of Fact and Conclusions of Law of the Confirmation Order, wherein the Court stated:

> the liquidation analysis … filed by the Debtors, the Confirmation Declarations, and all other applicable evidence proffered or adduced at the Confirmation Hearing (i) are reasonable, persuasive, and credible; (ii) are based on reasonable and sound methodologies and assumptions; (iii) provide a reasonable estimate of the liquidation values of the Debtors

upon hypothetical conversion to cases under chapter 7 of the Bankruptcy
Code …

*Confirmation Order, ¶ W, pg. 11.*

57.    The Liquidating Trustee disagrees for the reasons set forth int the
September 13th Correspondence.

58.    As this point in time, it is impossible for the parties to know what
the actual economic recoveries for creditors will be.  All the parties know now is that
creditor recoveries will be substantial.

59.    Given this situation, they only way for the Movants to mitigate the
severe economic harm described in paragraph 2 of the Status Report from befalling them
is for the prosecution of their Complaints to be stayed, until the parties know what the
actual creditor recoveries will be.  This mitigation of severe economic harm weighs
strongly in favor of the Court granting the requested stay.

60.    If the Movants do not receive a stay, they will be put in a position
where they either have to potentially pay too much to settle their respective Complaints,
or incur the counsel fees that will ensue from the blanket litigation of their matters.  Both
outcomes will cause economic severe economic hardship for the Movants.  And for
those Movants already experiencing economic and health problems, the results could
literally be devastating.

61.    So, on balance, the Movants' (i) very strong interest in obtaining a
stay, and (ii) the financial devastation they will experience if a stay is not granted all
weigh heavily in favor of the Court granting the relief requested by this Motion.

### III.    The Interests of the Court in Promoting Judicial
Economy Strongly Supports Granting a Stay

62.    The Movants submit that the granting of a stay will strongly

promote judicial economy in these cases by ultimately putting the parties into a position

that maximizes their chances for settlement.  Absent such relief, the Complaints will have

to be litigated.  The Movants believe that such litigation will be long, and drawn-out.

Despite the Bankruptcy Court's finding in paragraph NN of the Confirmation Order that

the Debtors were operating as a Ponzi scheme, the Movants do not believe the

Complaints can be resolved in a summary fashion, by way of any type of dispositive

motion by the Liquidating Trustee for two reasons.

63.    First, In order for the Ponzi scheme finding in paragraph NN of the

Confirmation Order to bind the Movants, and thereby cut off their normal defenses to

avoidance liability, the Movants had to have received notice of the Confirmation Hearing,

and the pleadings related thereto.  As explained by Judge Walsh in *In re CareMatrix

Corp.*, in order for a confirmation order to be *res judicata* upon a creditor, the creditor

has to have received notice of the confirmation hearing.  *In re CareMatrix Corp.*, 306

B.R. 478, 486 (Bankr. D. Del. 2004) ("CareMatrix overlooks the exception to the general

rule:  when a creditor does not receive adequate notice, the creditor is not bound by the

confirmation order."); *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620, 622-623

(10th Cir. 1984) (the creditor had knowledge of the debtor's reorganization proceeding

but did not receive adequate notice of the confirmation, thus they were not bound by the

confirmation order); *see also, In re Newstar Energy of Texas*, 280 B.R. 623, 626-627

(Bankr. W.D. Mich. 2002) (the court held that a creditor was not bound by the debtor's

fourth amended confirmation plan even though the creditor received notice of the third

amended confirmation plan, thus notice "was neither adequate or appropriate."); *In re*

*Johnson*, 274 B.R. 445 (Bankr. D.S.C. 2001) (debtor failed to adequately serve a creditor

with notice of a confirmation hearing, thus the creditor was not bound by the

confirmation order).  So, if a Movant did not receive proper notice, then the doctrine of

*res judicata* is inapplicable, and such a Movant would be entitled to a trial on all of the

issues and defenses that would otherwise have been precluded by paragraph NN of the

Confirmation Order.

       64.    As things currently stand, the Movants have 23 Complaints before

the Court.  Out of these 23 Complaints, 18 of  Movants were not on the Creditors' Matrix

(s*ee Certification of Debtors' Consolidated Creditor Matrix, Docket No. 34*), and do not

appear on the Affidavit of Service (s*ee Affidavit of Service, Docket No. 671*) that

documented the service of the notice of the Confirmation Hearing, and service of the

confirmation pleadings.  So, these 18 Movants are clearly not bound by paragraph NN of

the Confirmation Order.

       65.    Second, the five Movants who did receive notice of the

Confirmation Hearing also do not appear to be bound by the finding in paragraph NN of

the Confirmation Order.  The reason for this arises from the fact that paragraph NN of the

Confirmation Order does not stand alone, but must be read in conjunction with the terms

of the Plan itself.  Section 5.6.2 of the Plan states:

**Preservation of All Liquidation Trust Actions Not Expressly Settled or Released.**  The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trustee to pursue any such Avoidance Actions or Causes of Action. Unless a Liquidation Trust Actions is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Liquidation Trust Action for later resolution by the Liquidation Trust (including any Avoidance Actions or Causes Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist).  **As such, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after the Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released.**  In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor, the Liquidation Trust, or the Wind-Down Entity is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits.

*Plan, § 5.6.2, pg. 41-42* (emphasis added); *See Disclosure Statement, § IV, H, 6(b), pg.*

*102-103* (for same language in Disclosure Statement).

66.     None of the five Movants who were served with notice of the

Confirmation Hearing were specifically identified in the Disclosure Statement or the Plan

as being subject to any potential or existing Avoidance Actions or Causes of Action as a

Liquidation Trust Action.  Accordingly, pursuant to the above-noted language in bold

from Section 5.6.2 of the confirmed Plan, "no preclusion doctrine, including the doctrines

of res judicata" applies to such Avoidance Actions or Causes of Action.  Hence, even

those parties who received notice of the Confirmation Hearing – like the five Movants –

are not barred from raising any defenses to avoidance liability as a result of the Courts

finding in paragraph NN of the Confirmation Order, because that finding is not *res judicata* to them under Section 5.6.2 of the Plan.

67.     The upshot of this lack of notice of the Confirmation Hearing to 18 of the Movants, and the application of Section 5.6.2 of the Plan to the five Movants who did receive notice of the Confirmation Hearing, is that absent settlement, the Court is going to have 23 jury trials on these cases.[6]

68.     Going through 23 jury trials seems like a colossal waste of time and money – by the parties and the Court – when each of these matters may well be consensually resolved by the Parties after they know the actual creditor recoveries in these cases, and can readily calculate each Movants' respective net preference liability with mathematical certainty.

69.     In light of these two positions, the Movants submit that the interest of the Court in promoting judicial economy strongly weighs in favor of granting the Movants' request for a stay.

## IV.     Granting the Stay Will Not Harm the Interests of Other Creditors

70.     The Movants submit that if the Court grants their request for a stay, its impact upon the other creditors in these cases will be *de minimis*.  In particular, the granting of a stay will not delay distributions to the other creditors, nor will it reduce the amount of such anticipated distributions.  The Movants know this from the provisions

---

[6] Each of the Movants asserted their rights to a jury trial under the Seventh Amendment in their respective Answers to the Complaints.

of the Disclosure Statement itself, which were prepared by the Debtors, with the support

of all of the Committees.

71.    As noted above, none of the anticipated recoveries to creditors is

dependent upon the recoveries on any Avoidance Actions.  The Liquidation Analysis

established this point by (i) ascribing no value to the Liquidating Trust Assets, Net (as

that term is defined by the Plan), and (ii) stating in Note 3 of the Liquidation Analysis

that:

> [p]rojecting litigation recoveries and costs with accuracy is particularly difficult
> due to the uncertainties arising from ongoing discovery in pending litigation,
> disputed legal issues, limited data regarding collectability and the transfers of
> property in kind, which property itself may be difficult to accurately value.

*Liquidation Analysis, Note 3, pg. 147 of 503*.  Moreover, Article IV, § D 2 of the

Disclosure Statement states, in pertinent part, that:

- The Debtors estimate an ultimate range of aggregate recoveries
  from sales of real property and other Wind-Down Assets in the
  range of $521 million to $583 million, net of operating and other
  expenses through the end of the Liquidation Analysis projection
  period.

- The Debtors have not ascribed any value to recoveries that may be
  realized by the Liquidation Trust in respect of any Liquidation
  Trust Actions, but the Liquidation Trust Actions may generate
  significant value.

*Article IV, § D 2 of the Disclosure Statement, pg. 73* (emphasis added).

72.    Likewise, anticipated distributions under the Liquidating Trustee's

September 13th Correspondence are solely dependent upon proceeds received from the

Wind-Down Entity.  As stated by the Liquidating Trustee in the September 13th

Correspondence:

> The foregoing numbers are estimates, and are not guarantees of recovery, and it is projected to take approximately two years to realize these results. The actual results and the estimated timeline may vary from these estimates. Variations may be based on numerous factors, including, but not limited to, continued changes in the Los Angeles real estate market. **The foregoing estimates do not include any significant recoveries from litigation brought or to be brought by or on behalf of the Trust, as such recoveries are highly unpredictable at this time**.

*September 13th Correspondence, last page* (emphasis added).

73.    Since the request for a stay will not reduce or delay distributions to other creditors as provided in the Liquidation Analysis, or the September 13th Correspondence, the Movants submit that this factor strongly weighs in favor of granting a stay.

## V.    <u>The Public Interest Supports Granting a Stay</u>

74.    Finally, the Movants contend that granting the stay requested herein would be in the public interest for at least two reasons.

75.    First, the Movants submit that any type of action that can be legally taken to help prevent the elderly from becoming destitute and deprived of food, medical care, or shelter is in the public interest. As set forth on <u>Exhibit L</u>, the vast majority of the Movants are retired senior citizens. They live off of fixed income consisting of Social Security, and whatever investments (if any) they were able to accumulate during their working years.

76.    Unlike companies, that are the usual target of avoidance litigation, there is no way for the Movants to dilute the financial impact that these Complaints will have upon them among a group of third parties. The Movants are not selling anything,

and are not providing any services to anyone.  There is nobody to whom they can pass the financial impact of the avoidance claims.  They alone will have to bear it, and this will be financially devastating for certain of the Movants.

77.    Moreover, through no fault of his making, the Liquidating Trustee's successful prosecution of the Complaints will inflict the same damage upon the Movants that the Debtors' inflicted upon their creditors.  Just like the Liquidating Trustee noted in the Status Report, the Movants "many of whom are elderly and entrusted a substantial portion (or all) of their life savings to Woodbridge" will experience "severe economic harm" as a result of the prosecution of the Complaints.  *Status Report, ¶ 2.* The "harm" that this will cause to the Movants "cannot be overstated" and will "manifest differently" in each Movant.  *Id.*  "Retirement accounts – slowly built over decades of work" will be "wiped out."  *Id.*  "Seniors reliant on monthly checks from Woodbridge to pay a mortgage or rent" will "no longer make those payments."  *Id.*  "Illness" will "no longer be adequately treated."  *Id.*  If granting a stay can help mitigate these consequences, then it is definitely in the public interest.

78.    Second, the relief being sought by way of this Motion does not require the creation of any novel legal theory, or put the Court in the awkward position of having to "bend the law" to achieve an equitable outcome for a sympathetic group of defendants.

79.    Instead, all the Court has to do is exercise the inherent power that it already possesses over its docket to stay the prosecution of the Complaints, which is the most logical way possible to position the parties so that they will know with

mathematical certainty the actual distributions to creditors. This knowledge, in turn, will maximize the parties' chances at settlement, and potentially save the Movants hundreds of thousands of dollars, or millions of dollars, on a collective basis.

## SERVICE OF THE MOTION

80.     A pdf copy of the Motion was served upon counsel for the Liquidating Trustee via email on May 10, 2020. A hard copy of the Motion, and Exhibits thereto, was hand-delivered to the Wilmington Office of counsel for the Liquidating Trustee on May 10, 2020.

## CONCLUSION

81.     The Movants submit that the Court should stay all litigation on the Complaints until after the Wind-Down Entity has sold all of the Debtors' assets and distributed the net proceeds to the Liquidating Trustee. At that point in time, the parties will know with mathematical certainty the exact net preference liability for each of the Movants. This increased certainty should significantly assist the parties in settling the Complaints.

82.     As things currently stand, the Movants believe that it is grossly unfair for them to receive less credit towards the determination of their respective net preference liabilities than was projected under the Liquidation Analysis. This is especially so since the Liquidation Analysis was relied upon so heavily by the Court in connection with the confirmation of the Plan, and by creditors in connection with voting on the Plan. Likewise, if facts and circumstances really have changed as significantly as the Liquidating Trustee alleges, then it's unfair for the Liquidation Trust to have to take a

significant hit upon the valuation of the Movants' net preference liabilities.  Only by

waiting until after the Wind-Down Entity has completed its sales and distributed the

proceeds to the Liquidation Trust can the parties know for sure the net preference

liabilities at issue.

83.     Neither party should have to negotiate against its own self-interest

as part of the mediation of these matters, which is exactly what is happening now.

Likewise, the Movants submit that none of the parties should be forced to incur the costs

of litigation at this time, when the actual net preference values at issue could be

significantly less than the face values of the Complaints.

84.     Moreover, all five of the factors that are to be examined in

connection with a request for granting a stay are present under the facts and

circumstances of the Movants' cases.  First, the Liquidating Trustee will not be greatly

prejudiced by the granting of a stay.  Second, the Movants, however, will be extremely

prejudiced if a stay is not granted, and will experience an unmitigated version of all of the

damage noted by the Liquidating Trustee in paragraph 2 of the Status Report as a result

of the prosecution of the Complaints against them.  Third, considerations of judicial

economy strongly support the imposition of a stay.  As noted above, the granting of a stay

may well spare the Court from having to conduct 23 jury trials on these Complaints.

Fourth, granting the stay requested herein will not harm other creditors.  This is so,

because as noted in the Disclosure Statement and the September 13th Correspondence, all

of the funds upon which the creditor distributions are based are coming from the proceeds

of the sales by the Wind-Down Entity.  Fifth, the public interest will be greatly furthered

if the Court grants the stay. The vast majority of the Movants are retired senior citizens. They live on fixed-income, and have, or will have, serious medical issues as they continue to age. The impact that the Complaints will have upon them, and their retirement, should be minimized as much as possible within the confines of the law, which is exactly what granting the stay will do.

85.    Finally, and perhaps most importantly, the Movants are not legal abstractions on a page. They are real people that did nothing wrong. Because of their misfortune of investing with the Debtors, are Floyd and Lavonne Davis (a married couple who are 89 years old, and 87 years old, respectively), supposed to sell their house and become homeless so that they can pay the Liquidating Trustee the $317,791.67 being sought in the Complaint filed against them? Are Delton and Jean Christman (a married couple who are 81 years old, and 79 years old, respectively) supposed to forego medical care so that they can repay the $52,930.92 that they received from the Debtors? Does Jennifer Tom (who is a 72-year-old retiree) need to be destitute for the remainder of her life because she is the target of a $209,172.20 Complaint?

86.    While the Movants don't fault the Liquidating Trustee for doing his job, they implore the Court to grant the stay, and thereby mitigate the damage that will befall them as a result of the prosecution of these terribly unfair cases. Absent such relief, it is quite possible that the Movants will experience even more harm than the Debtors noteholders who were not paid, as they either have to try and pay settlements that are in excess of their net preference liability, or potentially have judgments entered against them for the face value of the Complaints. Not preventing such an outcome

would be a true injustice in the context of these cases, and cause irreparable harm to the Movants.

    WHEREFORE, for all of the foregoing reasons, the Movants respectfully request that the Court enter the proposed form of Order submitted contemporaneously with this Motion, staying the prosecution of the Complaints until after the Wind-Down Entity has sold all of the Debtors' real estate assets, and distributed all of the net proceeds to the Liquidation Trust in accordance with the terms of the Plan.

Dated:  May 10, 2021     LAW OFFICE OF CURTIS A. HEHN

           /s/ Curtis A. Hehn
           Curtis A. Hehn (Bar No. 4264)
           1007 N. Orange St., 4th Floor
           Wilmington, DE 19801
           Telephone:  (302) 757-3491
           Fax:  (302) 397-2155
           Email:  curtishehn@comcast.net

           *Counsel for Movants*

## <u>SUMMARY OF EXHIBITS TO MOTION</u>

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| A | Disclosure Statement |
| B | Plan |
| C | Liquidation Analysis |
| D | Sharp Declaration |
| E | Chin Declaration |
| F | Wind-Down Business Plan |
| G | Confirmation Brief |
| H | Confirmation Hearing Transcript |
| I | Confirmation Order |
| J | Plan Supplement |
| K | September 13th Correspondence |
| L | Spreadsheet Summarizing Complaints Filed Against Movants |
| M | List of 18 Consensually Resolved Preference Cases by Counsel for Movants and Counsel for Liquidating Trustee in Other Matters |
| N | Quarterly Report |
| O | Status Report |